CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
SEP 28 2006
JOHN F. CORCORAN, CLERK
BY: /s/ Linda Bright
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| WILLIAM J. NEESE, and DANIEL M. JOHNSON, on behalf of themselves and all persons similarly situated, | ) ) ) ) Civil Action No. 1:05cv00071 |
| Plaintiffs, | ) ) **MEMORANDUM OPINION** |
| v. | ) |
| MIKE JOHANNS, Secretary of Agriculture, UNITED STATES DEPARTMENT OF AGRICULTURE, COMMODITY CREDIT CORPORATION, and PHILIP MORRIS USA INC., | ) ) By: Samuel G. Wilson ) United States District Judge ) ) |
| Defendants. | ) |

The Fair and Equitable Tobacco Reform Act of 2004 (Title VI of the American Jobs Creation Act, Pub. L. No. 108-357) ("the Act")[1] repealed the tobacco marketing quota and related price support programs authorized by Title III of the Agricultural Adjustment Act of 1938 and the Agricultural Act of 1949, transforming the tobacco production system to a free market system at the end of the 2004 crop year. In order to transition them from the highly regulated market to the free market, the Act provides for a "buyout" of tobacco quota holders and active tobacco producers based on their historic quota levels. This buyout, which is annualized and paid over 10 years, is projected to cost $9.6 billion, and is funded through quarterly assessments on tobacco product manufacturers and importers imposed by the Secretary of Agriculture acting through the Department's Commodity Credit Corporation ("CCC"). The Act tasks the Secretary, who of course was previously tasked with the administration of Title III of the Agricultural

---

[1] Sections 611 through 613 of the American Job Creation Act of 2004, codified at 7 U.S.C.A. § 518 (West 2005).

Adjustment Act, with promulgating regulations necessary to implement the Act. The Secretary promulgated those regulations (entitled the Tobacco Transition Program, 7 C.F.R. §§ 1463.1-1463.201), delegated the program's administration to the Executive Vice President of the CCC, and established a sign-up period for tobacco quota holders and producers who intended to participate in the program. Plaintiffs, William J. Neese and Daniel M. Johnson, were burley tobacco producers in Washington County, Virginia, who entered into tobacco transition payment producer contracts with the CCC, and who transferred, through successor-in-interest contracts, their rights to program payments. Plaintiffs now contend that the Secretary's regulatory eligibility and payment formula for burley and flue-cured tobacco producers conflicts with the Act and failed to fully compensate them. They are seeking a declaratory judgment declaring that the Secretary's regulations are invalid, and to have the court enjoin or mandamus the Secretary to issue regulations in conformity with the Act. Plaintiffs are also seeking class certification for a class composed of burley and flue-cured tobacco producers whom they claim also were under-compensated under the Secretary's formula.[2] The court finds that plaintiffs lack standing, that even if they had standing they would not be entitled to equitable, extraordinary, or declaratory relief, and that the action is not properly maintainable as a class action. Accordingly, the court dismisses their suit and denies class certification.

I.

---

[2] Plaintiffs assert that the court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and authority to grant relief under 5 U.S.C. § 702, 28 U.S.C. § 1361 and 28 U.S.C. § 2201. On May 2, 2006, a magistrate judge submitted a Report and Recommendation recommending class certification. On June 26, 2006, the court received this case fully briefed on the issue of standing as well as class certification. Under the circumstances, the court found it appropriate to hear standing arguments, together with the issue of class certification, in order to gain a better understanding of the issue in the context of this complex regulatory program.

2

Case 1:05-cv-00071-SGW   Document 123   Filed 09/28/06   Page 2 of 12   Pageid#: 2444

The Act provides that, "[t]he Secretary shall offer to enter into a contract with each producer of quota tobacco, under which the producer of quota tobacco shall be entitled to receive payments . . . in exchange for the termination of tobacco marketing quotas and related price support. . . ." 7 U.S.C. § 518b(a). A producer who intends to enter into a contract with the Secretary must submit his application, "within such time, in such form, and in such manner as the Secretary may require." 7 U.S.C. § 518b(b)(1). The Secretary then establishes the eligible producer's "base quota level." 7 U.S.C. § 518b(c)(1). In the case of flue-cured and burley tobacco, the Act provides, in pertinent part, that "the base quota level for each producer of quota tobacco shall be equal to the effective tobacco marketing quota . . . under . . . the Agricultural Adjustment Act of 1938 for the 2002 marketing year for quota tobacco produced on the farm." 7 U.S.C. § 518b(c)(2). Subject to apportionment in the case of multiple producers, the Act specifies that, "the total amount of contract payments to which an eligible producer of quota tobacco is entitled," is determined by multiplying $3.00 per pound, "by the base quota level of the producer of quota tobacco." 7 U.S.C. § 518b(d)(1). An eligible producer of quota tobacco, "in all three of the 2002, 2003, or 2004 tobacco marketing years," is to receive the full $3.00 per pound rate; a producer in only two of those years receives a $2.00 per pound rate; and a producer in only one of those years receives a $1.00 per pound rate (hereinafter the "1/3rd principle"). 7 U.S.C. § 518b(d)(3). The Act directs the Secretary to equitably distribute payments to multiple producers of the same quota tobacco based on their "relative share" of "risk" in producing the quota tobacco (hereinafter the "multiple producer provision") and, *such other factors as the Secretary considers appropriate.*" 7 U.S.C. § 518b(b)(2)(emphasis added). The Act calls for the Secretary to pay each producer one-tenth of his total contract payment amount, "during each of

3

the fiscal years 2005 through 2014," 7 U.S.C. § 518b(d)(2), but facilitates lump-sum payments by permitting producers to assign their payment rights to financial institutions. 7 U.S.C. § 518(c)(e). Payments are funded through quarterly assessments on tobacco product manufacturers and importers by the CCC, which deposits the proceeds into a revolving trust fund, the "Tobacco Trust Fund," which Congress created specifically to carry out the Act's purposes. 7 U.S.C. § 518(e)(a). The CCC's authority to make assessments under the Act "terminates on September 30, 2014," 7 U.S.C. § 518(d)(k), and the Act limits trust fund expenditures to $10,140,000,000. 7 U.S.C. § 518(f). Finally, the Act gives the Secretary authority to promulgate "such regulations as are necessary to implement" its provisions without regard to the notice and comment provisions of 5 U.S.C. § 553 and permits him to determine the effective date of those regulations. See 7 U.S.C. § 519(a).[3]

On April 4, 2005, the Secretary published the Department's "final rule" in the Federal Register – his regulations governing the "Tobacco Transition Payment Program" (hereinafter the "TTPP"or the "program"). See Tobacco Transition Payment Program - Final Rule, 70 Fed. Reg. 17150-17166 (April 4, 2005). The regulations essentially were effective immediately and provided that the enrollment period ended June 17, 2005. 7 C.F.R. §§ 1463.107 (2006). The regulations establish a complex formula that purportedly factors the Act's directives that payments equal the 2002 effective quota times $3.00, adjusted for multiple producers and the 1/3rd principle. 7 C.F.R. § 1463.106. With this formula and the quota holder formula in mind, the preamble to the final rule noted that payments to quota holders and producers would total

---

[3] The Act states that "the Secretary shall use the authority provided under section 808 of Title 5." That section gives an agency authority to determine when its rules will take effect.

4

approximately $9.6 billion, an amount that precisely tracked Congress' estimate, leaving approximately $540 million of the total $10.14 billion "maximum allowed assessments" to cover anticipated, specified losses and eligible expenses. Tobacco Transition Payment Program - Final Rule, 70 Fed. Reg. at 17156. The Secretary estimated, "based upon the specified payment rate and known quota amounts" that $2.9 billion of the expected $9.6 billion in total payments would be paid to eligible producers. Tobacco Transition Payment Program - Final Rule, 70 Fed. Reg. at 17157. In fact, to date, the CCC has entered into 183,000 payout contracts with producers, totaling $2.866 billion, and producers have entered into "successor-in-interest contracts" totaling $600 million. Hr'g Tr. 10, 95 (August 30, 2006).

Plaintiffs were burley tobacco producers in Washington County, Virginia, who entered into tobacco transition producer contracts with the CCC in May, June, and July of 2005. Each contract provides that the producer and the CCC agree to the terms of the contract, including those contained in the contract's appendix. The appendix references the regulations governing the contract, which include the challenged payment formula. The appendix specifically provides that, "an eligible producer who signs [the contract] signifies agreement with the terms and conditions contained in the . . . Appendix." Plaintiffs concede that, at the time they entered the contracts, they understood how the CCC would calculate their payments and how much the CCC would pay them. (Hr'g Tr. 27-28, August 30, 2006). Neese's total contract payment amount was $189,793, and Johnson's $216,977.[4] See Neese Decl. 3, April 28, 2006; Johnson Decl. 4, April

---

[4] Despite their express acknowledgment that they agreed to the contract's terms and conditions, plaintiffs sought to challenge the Secretary's regulatory payment formula through administrative channels, and the Secretary found that those channels were not available to resolve the challenge.

5

28, 2006. Plaintiffs, in turn, entered into authorized, successor-in-interest contracts; Neese in October 2005, and Johnson in December 2005. As with plaintiff's producer contracts, each contract plainly states that it is subject to the Secretary's regulations. Each contract provides that it transfers "to the [s]uccessor all right, title and interest of the [t]ransferor in and to the [e]xisting contract," and that execution of the contract by the successor and the CCC would immediately "terminate all rights of the transferor with respect to the [e]xisting contract" and "transfer all rights in respect of the [e]xisting contract to the [s]uccessor . . . ."

Neese claims that the total payment he agreed to under his producer contract was $373,359 less that he was entitled to under the Act, and Johnson claims his was $286,189 less. On August 16, 2005, two months after the June 17, 2005 sign-up period specified by the Secretary for quota holders and producers to apply for payment, plaintiffs brought this suit against the Secretary and the CCC challenging the Secretary's regulatory eligibility and payment formula for burley and flue-cured tobacco producers. They seek to maintain the suit as a class action with the class defined as:

> All burley and flue-cured tobacco producers who contracted for payments under the USDA tobacco regulations (7 C.F.R. § 1463) and received less than $3.00 multiplied by their effective tobacco marketing quota, after being reduced where applicable by 7 U.S.C. § 518d(3) for producers who did not produce in all years 2002, 2003, and 2004, or divided were applicable under Section 518b(2) for multiple producers of the same quota tobacco.

Phillip Morris USA, Inc. ("Phillip Morris") has intervened, has moved to dismiss for lack of jurisdiction on the ground that plaintiffs lack standing because plaintiffs transferred, through "successor- in-interest" contracts, their rights to receive payment under the Act, and has moved to dismiss on the ground that defendants have failed to join necessary and indispensable parties--

6

burley and flue-cured tobacco producers who would receive less money if plaintiffs' challenge to the regulations were successful. All parties have moved for summary judgment on the issue of the validity of the Secretary's regulations implementing the payment formula.

## II.

Phillip Morris has moved to dismiss plaintiffs' suit for lack of jurisdiction. It claims plaintiffs lack standing because they transferred all of their interests to third parties through successor-in-interest contracts. Plaintiffs essentially argue that they have standing despite entering into successor- in-interest contracts because they are seeking to recover based on their statutory rights and not under their contracts. The court agrees with Phillip Morris that plaintiffs lack standing, but not only because they have assigned their interests to third parties, but also because they entered into contracts exchanging their rights as producers of quota tobacco for contractual payments. A favorable decision on the merits, therefore, a decision that the Secretary's formula for contractual payments conflicts with the statute, would provide them no relief, an essential component of constitutional standing.

To satisfy Article III's standing requirements, a plaintiff much show that: "(1) he has suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." The Friends for Farrell Parkway, LLC v. Stasko, 282 F.3d 315, 320 (4th Cir. 2002). In the present case, the court assumes that plaintiffs are able to meet constitutional standing's first two requirements because the court assumes, without deciding, that plaintiff's could have recovered more under their reading of the statute, had they not entered into contracts with the Secretary and had they not transferred their interests to third parties. However,

7

they cannot satisfy constitutional standing's third requirement because they *have* entered into contracts with the Secretary, and they *have* transferred their interests to third parties.

Plaintiffs assume that as producers of quota tobacco they had statutory rights separate and apart from the rights created by their producer contracts. Therefore, they argue, they are not challenging their contracts, but are seeking additional compensation directly under the Act's formula. The argument, however, is analytically flawed because the Act and plaintiffs' producer contracts provide that plaintiffs are giving up their rights as producers of quota tobacco *in exchange for* their rights to receive payment under their producer contracts. 7 U.S.C. § 518b(a). Each contract provides that the producer and the CCC agree to the terms of the contract, including those contained in the contract's appendix, and the appendix references the regulations governing the contract, which include the challenged payment formula.[5] Therefore, plaintiffs cannot challenge the Secretary's formula separate and apart from a challenge to their producer contracts, which they have transferred to third parties. Under the circumstances, they cannot benefit from declaratory relief, injunctive relief, or mandamus, and they lack constitutional standing to maintain this suit.[6]

---

[5] The appendix also specifically provides that, "an eligible producer who signs [the contract] signifies agreement with the terms and conditions contained in the . . . Appendix," and plaintiffs concede that, at the time they entered the producer contracts, they understood how the CCC would calculate their payments and how much they would be paid.

[6] During oral argument, the court raised *sua sponte* the question of whether plaintiffs' suit was in reality an action under an act of Congress mandating payment, subject to the Court of Federal Claims jurisdiction, See Gray v. United States, 14 Ct. Cl. 390 (1988), rather than a suit brought properly under 5 U.S.C. § 702 in accordance with the teachings of Bowen v. Massachusetts, 487 U.S. 879 (1988). See Marceau v. Blackfeet Housing Authority, 455 F.3d 974, 985 (9th Cir. 2006) (Where the real effort of the complaining party is to obtain money from the Federal Government, the exclusive jurisdiction of the Court of Claims over non-tort claims exceeding $10,000 cannot be evaded or avoided by framing a district court complaint to appear

8

## III.

Even if plaintiffs had standing, the court would not grant the discretionary and equitable relief they seek because rather than file suit to block the Secretary's regulations after the Secretary published them in the Federal Register on April 4, 2005, plaintiffs instead entered into producer contracts with the CCC and compounded the regulatory program chaos discretionary relief would inflict by transferring their contracts to third parties.

Equitable relief is discretionary, Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp., 17 F.3d 691, 693 (4th Cir. 1994), as are declaratory relief, Aetna Casualty & Surety Co., v. Ind-Com Elec. Co, 139 F.3d 419 (4th Cir. 1998), and the extraordinary remedy of mandamus, United States ex. Rel. Rahman v. Oncology Assocs., 198 F.3d 502, 511 (4th Cir. 1999) (citing Kerr v. U.S. Dist. Court for the N. Dist. Of Cal., 426 U.S. 394, 403 (1976)[7], which is administered with equitable principles in the interest of justice and at the discretion of the court. Kerr, 426 U.S. at 403. With equitable principles in mind, this court finds that plaintiffs would not be entitled to discretionary relief even if the court had jurisdiction.

Congress capped the buyout program at $10.14 billion, and it clearly understood and expected that the Secretary would enter into contracts with producers approximating $2.9 billion.

---

to seek only injunctive, mandatory or declaratory relief against government officials or the government itself). None of the parties argued in favor of Court of Federal Claims jurisdiction. Because the court dismisses the suit for lack of constitutional standing, a jurisdictional dismissal, it is not compelled to decide the issue. For the same reason, the court also does not reach the issue of whether the court should dismiss the suit because plaintiffs have failed to join indispensable parties under Rule 19 of the Federal Rules of Civil Procedure - producers who would be disadvantaged by plaintiffs construction of the formula.

[7] See Kerr, 426 U.S. at 403 ("A judicial readiness to issue the writ of mandamus in anything less than an extraordinary situation would run the real risk of defeating the very policies sought to be furthered by [the] judgment of Congress").

9

In fact, the Secretary to date has entered into 183,000 contracts with producers totaling $2.866 billion, and those producers have, in turn, entered into successor-in-interest contracts totaling $600 million. It has been suggested that this suit presents a "zero-sum" calculus, that either formula produces essentially the same payout to the producers as a class. However, if this is true, it is only true theoretically as far as the Tobacco Trust Fund is concerned, measured at the time the regulations were promulgated and before the CCC entered into 183,000 producer contracts, and before many of those producers entered into successor-in-interest contracts. It is not "zero-sum" practically speaking, retrospectively as we stand today, unless those who would be disadvantaged by plaintiffs' view of the correct formula were required to disgorge. It is certainly not "zero-sum" from an individual producer's perspective because the Secretary's formula provides for contract payments to producers who produced quota tobacco in any one or more of the years 2002, 2003, and 2004, in contrast to plaintiffs' competing formula that provides payment only for those who produced quota tobacco in the year 2002.

Discretionary relief at this juncture, even if practicable, and it is not, would substantially disrupt the buyout program and the vested interest of those producers who are satisfied with their contracts and would stand to lose under plaintiffs construction of the buyout formula. It, likewise, could trigger additional assessments on tobacco product manufacturers and importers and push trust fund expenditures towards the statutory cap. Although disruption *alone* would be an insufficient basis to deny discretionary relief, if legal relief were inadequate, we are at this juncture because plaintiffs did not seek to enjoin the Secretary from implementing his regulatory

10

formula, entered into producer contracts, and transferred their interests to third parties.[8]

### IV.

Since the court has concluded that plaintiffs lack constitutional standing to pursue their claims, they may not bring a lawsuit on behalf of a class of individuals they claim are similarly situated. See Carter v. West Publishing Co., 225 F. 3d 1258, 1262 (11th Cir. 2000); Courtney v. Smith, 297 F.3d 455 (6th Cir. 2002). Contra In Re Relafen Antitrust Litigation, 221 F.R.D. 260 (D Mass. 2004 ). Accordingly, the court denies their motion for class certification.[9]

---

[8] The court also notes that it views plaintiffs' request for injunctive relief or mandamus to compel the Secretary to issue new regulations to be "window dressing." Under their theory no regulatory formula is even necessary, and certainly none would be entitled to deference in accordance with Chevron USA v. Natural Resources Defense Council, Inc., 457 U.S. 837 (1984), because the statutory formula is clear.

[9] Federal Rule of Civil Procedure 23(a)(4) requires that named class representatives be able to adequately represent class members. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997). The adequacy inquiry serves to uncover conflicts of interest between the named parties and the class they seek to represent. Id. at 625. A class representative, "must be part of the class and possess the same interest and suffer the same injury as the class members." East Tex. Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403 (1977). Here, the pleadings reveal inter-class conflicts that would impede plaintiffs' ability to represent the class. Plaintiffs have alleged that under the Act, producers in 2003 or 2004 who did not produce in 2002 were not entitled to buyout payments; yet, the class they purport to represent includes, on its face, all producers - even those who did not produce in 2002. Plaintiffs cannot seek an interpretation of the Act that would admittedly deny a group of producers buyout payments, while at the same time represent their interests in this matter. Therefore, even if plaintiffs had standing, the court would still deny their request for class certification.

## V.

For the foregoing reasons, the court grants defendant's motion to dismiss, and denies plaintiff's motion for class certification.

**ENTER**: September 28, 2006.

_____
UNITED STATES DISTRICT JUDGE

12